RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TROY R. STUART,

*Petitioner-Appellant,*

*v.*

No. 05-3092

JULIUS WILSON, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 03-00469—John R. Adams, District Judge.

Argued: February 1, 2006

Decided and Filed: March 27, 2006

Before: RYAN, CLAY, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Nathan A. Ray, Akron, Ohio, for Appellant. Erik J. Clark, OHIO ATTORNEY GENERAL OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:** Nathan A. Ray, Akron, Ohio, for Appellant. Gregory T. Hartke, OHIO ATTORNEY GENERAL OFFICE, CORRECTIONS LITIGATION SECTION, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Petitioner Troy Stuart appeals the December 13, 2004 order of the United States District Court for the Northern District of Ohio granting the motion of Respondent Julius Wilson, Warden, to dismiss Petitioner's habeas application filed pursuant to 28 U.S.C. § 2254. Petitioner is currently incarcerated in Ohio state prison, having been convicted and sentenced for the state crimes of rape of a victim under the age of thirteen and gross sexual imposition of a victim under the age of thirteen. For the following reasons, we **AFFIRM** the order of the district court.

## I. BACKGROUND

### A. STATE PROCEEDINGS

On October 14, 1999, an Ohio state grand jury indicted Petitioner for two counts of rape by force of a victim under the age of thirteen and one count of gross sexual imposition of a victim under

1

the age of thirteen. The alleged child victim in this case was Petitioner's nephew ("D.S."), the son of Petitioner's older brother.

On February 4, 2000, the prosecution notified the court of its intention to admit into evidence D.S.'s out-of-court statements to his mother ("Lisa"), father ("Lorin"), aunt ("Aunt Sue"), cousin ("Cousin Cindy"), and the investigating detective pursuant to Ohio Evidence Rule 807. Under the state rule, the hearsay statement of an alleged victim of a sexual crime under the age of twelve is admissible if: (1) the state court finds particularized guarantees of trustworthiness of the hearsay statement; (2) the victim's testimony is not reasonably obtainable by the party seeking to admit the hearsay statement; (3) there is independent proof of the sexual act; and (4) at least ten days before the trial or hearing, the party seeking to admit the hearsay statement notifies the other parties of the content of the statement, when and where the statement was made, the identity of the witness to testify as to the statement, and the circumstances surrounding the statement that demonstrate particularized guarantees of trustworthiness. Ohio Evid. R. 807(A). The party seeking to admit the hearsay statement may satisfy requirement (2) if "[t]he child refuses to testify concerning the subject matter of the statement or claims a lack of memory of the subject matter of the statement after a person trusted by the child, in the presence of the court, urges the child to both describe the acts described by the statement and to testify." Ohio Evid. R. 807(B)(1).

On February 17, 2000, the state trial court conducted an evidentiary hearing in order to determine whether the prosecution met the requirements of Rule 807. D.S. was examined for competency. He testified that he was five years old, and he testified that he knew the difference between telling the truth and telling a lie. He promised that he would tell the truth during the hearing. On cross-examination, D.S. admitted that he sometimes lied to his parents. When asked if he lied to his Uncle Troy, Petitioner in this case, D.S. said yes, but he did not want to talk about it. He testified that no one had told him what to say and that he was going to tell the truth. The state trial court found that D.S. was competent to testify.

The investigating detective on the case then testified at the hearing. She testified that on October 5, 1999, D.S., his mother, and his father went to the police station to report a crime. The detective was made aware of some of the factual circumstances surrounding the case, and she then interviewed D.S. in the presence of his mother. After some small talk with D.S., the detective asked if he knew the difference between a good touch and a bad touch. He stated that he did know the difference; he identified his mother's kiss and his father's hug as good touches, and he identified being spanked as a bad touch. The detective then asked if being touched on his "pee-pee" was a good touch or bad touch, and D.S. responded that it was a bad touch. The detective asked if anyone had touched his penis, and D.S. responded that Petitioner had done so. The detective then asked if Petitioner had touched D.S.'s penis, and D.S. said yes. The detective then asked if D.S. had touched Petitioner's penis, and D.S. said yes. The detective asked where this conduct had occurred, and D.S. answered that it had taken place in his parents' bed or D.S.'s bed. When asked how many times this conduct had occurred, D.S. stated that it had occurred many times. The detective then ended the conversation with D.S. and spoke to his parents. The parents informed the detective that D.S. had previously told them that D.S. and Petitioner had engaged in oral sex. After a few minutes, the detective re-interviewed D.S. and asked if there was anything D.S. did not tell the detective. D.S. answered, "Yes, yeah, Uncle Troy made me suck his pee-pee." (J.A. at 120.) He also stated that Petitioner performed oral sex on D.S. D.S. stated that the oral sex had occurred on many occasions. On cross-examination, the detective testified that she had not tape-recorded her interview of D.S., but she did take notes.

D.S.'s father, Lorin, also testified at the hearing. Lorin testified that he and his family moved back to his father's (D.S.'s grandfather and Petitioner's father) house in September or October of 1998. Petitioner also lived at the house. When D.S.'s father and mother were at work, Petitioner would often babysit the family's children. On October 5, 1999, Lorin spoke with Aunt Sue (Lorin's

sister) at Aunt Sue's house, and Aunt Sue stated that in 1997 she had observed D.S. "playing with himself." (J.A. at 174.) She asked D.S. why he was doing that, and he responded, "[B]ecause Uncle Troy does." (J.A. at 174.) Aunt Sue told Lorin that she did not know if Petitioner was "fooling around" with D.S., but that Lorin should find out. (J.A. at 174.) After this conversation, Lorin returned to his father's house, where D.S. was at the time. Lorin asked D.S. if there was anyone who was touching him in the wrong places, and D.S. answered, "Yes, Uncle Troy." (J.A. at 141.) Lorin asked what Petitioner did to D.S., and D.S. responded that Petitioner made D.S. perform oral sex on Petitioner, and that Petitioner would perform oral sex on D.S. Lorin testified that after October 5, 1999, he did not ask D.S. questions about what had occurred between D.S. and Petitioner, but D.S. twice raised the subject, stating that Petitioner would get into bed with D.S. and engage in the sexual abuse.

D.S.'s mother, Lisa, also testified at the hearing. Lisa testified that on October 5, 1999, Lorin recounted to Lisa the conversation that he had with D.S. about Petitioner and the sexual conduct between D.S. and Petitioner. She spoke with D.S. about the matter, and D.S. stated that the abuse had in fact happened, and that he was sorry for it. It is unclear from Lisa's testimony whether she used leading questions or the nature of the conversation. Lisa testified that she did not remember the exact conversation. She also stated that after that day, D.S. would "just come[ ] up" and talk about what had occurred between Petitioner and D.S., stating that Petitioner should not have "done that" and asking "why daddy didn't stop it." (J.A. at 186.) D.S. also stated that the abuse would occur when his older brother was at school. Lisa testified that she did not ask D.S. questions, but rather D.S. would just come up and talk about what had occurred. On cross-examination, Lisa admitted that in June 1998, the children's services board ("CSB") had received information that Petitioner had abused D.S. A CSB worker went to the family's home and interviewed both D.S. and his older brother. Both boys denied any abuse. Lisa did not know who had made the allegations of abuse, but she suspected that Aunt Sue or Cousin Cindy had done so as retribution for an altercation between Cousin Cindy, her brother, and Petitioner that had taken place earlier. Lisa admitted that Aunt Sue and Cousin Cindy did not say anything to her about Petitioner's abuse of D.S., and that her only basis of knowledge of the abuse was her conversation with D.S.

D.S. then testified. Petitioner's counsel objected to the presence of Lorin and Lisa, so the court ordered the parents to leave the courtroom. Both the prosecution and Petitioner's counsel asked D.S. if he would talk about what had happened between D.S. and Petitioner, and D.S. refused to answer. D.S. did testify that he did not lie to his father or to the investigating detective. D.S. also testified that no one had told him to refuse to answer questions about Petitioner.

D.S.'s aunt, Aunt Sue, then testified. She stated that in 1996,[1] she observed D.S. with his hands in his pants. She said to D.S., "Hey, boy, quit that," and D.S. responded, "Uncle Troy does that." (J.A. at 228.) Both Lorin and Petitioner were present during this occasion. She also testified that she recounted this event to Lorin on October 5, 1999. She also testified that her daughter, Cousin Cindy, had made accusations against Petitioner in March 1997 or 1998.

D.S.'s cousin, Cousin Cindy, also testified at the hearing. She stated that on March 18, 1997, her birthday, she saw D.S. playing with his penis. She asked what he was doing, and she said that he should not be doing that. D.S. replied that Uncle Troy does. Cousin Cindy then asked D.S. what else Petitioner did. He replied that "Troy kissed his pee-pee and played with his butt hole." (J.A. at 241.) She testified that she told her mother what D.S. had said that day. About one year later, she told Petitioner that he would pay for what he had done to D.S. She testified that on October 6, 1999, she told Lorin what D.S. had said to her on March 18, 1997. On cross-examination, Cousin Cindy

---

[1] There seems to be confusion between Lorin and Aunt Sue as to when the event occurred, as Lorin testified that the event occurred in 1997.

admitted that D.S. could have meant that Petitioner played with his own penis and anus.  She also testified that there was some question about whether Petitioner had previously stolen marijuana from her.

Shelly Kekic, a social worker with CSB, also testified at the hearing.  She testified that in June 1998, she went to the family's home in response to an allegation that Petitioner was sexually abusing D.S.  She interviewed Lisa, Petitioner, Petitioner's father, D.S. and D.S.'s older brother.  D.S. denied that he was touched inappropriately by anyone.  Petitioner denied sexually abusing D.S.

On March 21, 2000, the state trial court ruled that the hearsay statements were admissible under Ohio Evidence Rule 807.  The state trial court found that while D.S. was competent to testify, he was not available to testify at trial:

> It ultimately became clear that [D.S.] was not, would not, and could not be coaxed, pressured, or cajoled into answering questions in the sexual area and relative to Uncle Troy.  It was clear that [D.S.], although physically present and competent, was in fact unavailable to testify relative to any substantive matters and issues before the Court in this case.  There is no reasonable basis for this Court to believe or assume that availability in this area will improve or change.  Thus, [D.S.] is found to be not reasonably available to testify in this case.

(J.A. at 305.)  The state trial court then addressed the issue of indicia of trustworthiness.  The court found that D.S.'s statements to Aunt Sue and Cousin Cindy, where both asked D.S. what he was doing when he was playing with his penis, "were spontaneous, clearly not orchestrated or directed." (J.A. at 306.)  The court also found that D.S.'s response to Lorin's question of whether anyone had touched him in the wrong places was also spontaneous and very specific in light of his father's general question.  The court also found that D.S.'s response to Lisa's questioning was "spontaneous and responsive, consistent with statements to three others." (J.A. at 306.)  Likewise, the court found that D.S.'s response to the investigating detective was consistent.  In sum, the court found D.S.'s statements to bear particularized guarantees of trustworthiness:

> In this case, considering the totality of the circumstances, the Court find [sic] particularized guarantee [sic] that [D.S.'s] statements are trustworthy.  These indicia include the spontaneity of the statements to aunts [sic, should be aunt and cousin] and parents, the internal consistency as to all, the mental state of the child, [D.S.'s] lack of motive to fabricate, his use of terminology unexpected of a child of similar age, the means by which the statements were elicited, as well as the amount of time between acts and statements and circumstances of this case.  In summary, [D.S.'s] statements consistently referred only to Uncle Troy and what he did.  The terminology of "kiss his pee-pee" would not normally be expected of a four/five year old.  The fact of the babysitting arrangement offered ample opportunity over a specific period of time.  The unprovoked or directed statements to the aunts [sic] had a particularly high degree of spontaneity and consistency.

(J.A. at 306-07.)

The court also found independent proof of sexual acts.  The court referred to a letter that Lorin and his father found in Petitioner's bedroom.[2]  The court ultimately concluded that the hearsay evidence was admissible under Ohio Evidence Rule 807.

---

[2] We will not delve into the details of this issue, as it is not before this Court.

On March 31, 2000, the jury found Petitioner guilty on all three counts. The state trial court sentenced Petitioner to two life sentence for the rapes and one year imprisonment for the gross sexual imposition, with the sentences to run concurrently. Petitioner appealed his conviction and sentence.

The state court of appeals affirmed. Petitioner made two claims before the state court of appeals that are relevant to the instant case before this Court. In his Third Assignment of Error, Petitioner claimed that the admission of the hearsay statements was improper under Ohio Evidence Rule 807, and he claimed that the admission of the hearsay statements also violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. In his Seventh Assignment of Error, Petitioner claimed that the state trial court committed error when it denied his request to call D.S. as a witness, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

The state court of appeals found that the trial court conducted the proper analysis as to the admissibility of the hearsay statements under Ohio Evidence Rule 807. As to the particularized guarantees of trustworthiness, the court found that the parents had enjoyed a good relationship with Petitioner before the discovery of the abuse, so there was no motive to lie. In addition, the explicit nature of the child's statements also indicated trustworthiness. Finally, the court also agreed with the state trial court that the statements were spontaneous. As to unavailability, the court found that an uncooperative child could be determined to be unavailable under Rule 807. The court also found that the prosecution had met the remaining two requirements, independent evidence of the sexual act and proper notice of the intent to use the hearsay statements.

The court also found that under Rule 807, if the child victim was uncooperative and thus found unavailable, the defendant did not have the right to call the child victim to testify as a witness. The court held that Petitioner's right to confrontation under the Sixth Amendment of the Constitution had not been violated by the admission of the hearsay statements under Rule 807, as the Ohio Supreme Court had already ruled that Rule 807 met the Confrontation Clause requirements in *State v. Storch*, 612 N.E.2d 305 (Ohio 1993).

Petitioner appealed the decision to the state supreme court. In his memorandum in support of the appeal, he argued, among other things, that the admission of the hearsay statements did not conform to Ohio Evidence Rule 807 and violated his due process rights and his right to confrontation under the United States Constitution. The Ohio Supreme Court denied Petitioner leave to appeal. The United States Supreme Court denied Petitioner's petition for writ of certiorari.

## B.    FEDERAL PROCEEDINGS

On March 17, 2003, Petitioner filed a habeas petition pursuant to 28 U.S.C. § 2254 in federal district court. On August 28, 2003, Petitioner filed a motion to file a corrected memorandum in support of his petition, as the original memorandum was missing several pages. The district court granted the motion. In his corrected memorandum, Petitioner argued, among other things, that the admission of the hearsay statements was a violation of his due process rights and his right to confrontation under the United States Constitution. Petitioner made three arguments: (1) the declarant was not unavailable to testify at trial; (2) the hearsay statements did not have particularized guarantees of trustworthiness; and (3) there was no independent proof of the sexual act.[3]

---

[3]We note that Petitioner's third claim, that there was no independent proof of the sexual act, was a claim that the state trial court violated Ohio Evidence Rule 807. Generally speaking, a claim that a state trial court violated state law is an insufficient basis for federal habeas relief: "Errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983) (citations omitted). Only errors of state law that result in a denial of fundamental fairness in violation of due

On March 12, 2004, the magistrate judge recommended that the habeas petition be dismissed. As to the admission of the hearsay statements, the magistrate judge found that to the extent Petitioner challenged the admission on failure to conform to the requirements of Ohio Evidence Rule 807, Petitioner did not have a cognizable claim, as the challenge was one solely of state law.[4] *See* note 3, *supra*. The magistrate judge found that Petitioner's argument that his rights under the United States Constitution were violated was made only in passing to the state appeals and state supreme court. The magistrate judge also found that the state appeals court and the state supreme court had made their decisions based solely on state law grounds. The magistrate judge therefore concluded that Petitioner had failed to fairly present this claim to the state courts. The magistrate judge also concluded that Petitioner had procedurally defaulted this claim in state court, as the time limitations for post-conviction petitions under state law had since expired. This also meant that Petitioner had technically exhausted his state court remedies. The magistrate judge found that Petitioner failed to show adequate cause and prejudice for the procedural default, and he failed to show a miscarriage of justice. The magistrate judge thus recommended that the district court reject this claim.

Petitioner appealed the magistrate judge's recommendation only with respect to the claim of improper admission of the hearsay statements. Petitioner argued that he properly presented to the state courts his claim under the Confrontation Clause of the United States Constitution. Petitioner asserted that he specifically identified the source of federal law underlying his claim.

On December 13, 2004, the district court adopted the magistrate judge's recommendation, with modification, and dismissed Petitioner's habeas petition. The modification dealt with whether Petitioner fairly presented his right to confrontation claim to the state courts. The district court found that Petitioner had fairly presented this claim, so his claim was not barred by state law and he therefore did not need to show cause and prejudice for his failure to raise the claim in state court. The court cited to *Baldwin v. Reese*, where the Supreme Court explained:

> A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal."

(J.A. at 1274 (quoting *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).) In his appeals to both the state appeals court and the state supreme court, Petitioner stated that his claim as to the admission of the hearsay statements was based in part on the United States Constitution, so that he in fact fairly presented the claim to the state courts.

While Petitioner had presented his right to confrontation claim to the state courts, the district court held that the claim failed under the standards of the Antiterrorism and Effective Death Penalty

---

process are cognizable in federal habeas corpus proceedings. *Id.* (citations omitted).

The question then becomes whether the state trial court's admission of the hearsay statements, in light of the alleged lack of independent proof of the sexual act, resulted in a due process violation. That question, however, is not before this Court; while Petitioner argued to the district court that there was no independent proof of the sexual act, he does not raise this argument in his brief to this Court.

[4]Specifically, Petitioner argued to the district court that the hearsay evidence was inadmissible under Ohio Evidence Rule 807 because D.S. was available to testify, D.S.'s hearsay statements did not have particularized guarantees of trustworthiness, and there was no independent proof of the sexual act. We note that while Ohio Evidence Rule 807 requires unavailability and particularized guarantees of trustworthiness, these same concepts are applicable to the federal Confrontation Clause analysis. *See infra*. In other words, while a state law violation is generally not cognizable at federal habeas, *see* note 3, *supra*, an action that is a state law violation may also be simultaneously a federal constitutional or statutory violation, which is cognizable on federal habeas.

Act ("AEDPA"), 28 U.S.C. § 2254. Petitioner claimed that the admission of the hearsay statements was predicated on the state trial court's finding of the unavailability of the declarant, and that this finding was contrary to the clearly established Supreme Court precedents found in *Coy v. Iowa*, 487 U.S. 1012 (1986), and *Maryland v. Craig*, 497 U.S. 836 (1990). The district court rejected this argument, relying on the Supreme Court's holding in *White v. Illinois*, 502 U.S. 346 (1992), where the Supreme Court limited *Coy* and *Craig* to the issue of what requirements were necessary under the Confrontation Clause when a witness actually testified. The Supreme Court specifically refused to extend the holdings of *Coy* and *Craig* to the admission of hearsay statements. In Petitioner's case, D.S. did not actually testify, so *Coy* and *Craig* were inapposite. The district court did issue a certificate of appealability with respect to the claim of right to confrontation.

On December 13, 2004, Petitioner timely filed a notice of appeal.

## II.  DISCUSSION

### A.   THE STATE COURT'S DECISION TO ADMIT HEARSAY EVIDENCE WAS NOT CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW WHEN THE CHILD VICTIM DECLARANT WAS TECHNICALLY NOT UNAVAILABLE TO TESTIFY BUT WAS UNWILLING TO TESTIFY

#### 1.    Preservation of the Issue

We agree with the district court's holding that Petitioner fairly presented his right to confrontation claim to the state courts.

#### 2.    Standard of Review

When reviewing a district court's habeas decision, this Court reviews the legal conclusions *de novo* and the factual findings for clear error. *Jones v. Jamrog*, 414 F.3d 585, 590 (6th Cir. 2005). Because Petitioner filed his habeas petition after the effective date of AEDPA, AEDPA applies. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the strictures of that statute, the federal courts may not grant habeas relief for a state prisoner unless the state court adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner argues that AEDPA is inapplicable in this case and that he is entitled to *de novo* review because the state courts did not fully address the merits of his right to confrontation claim. We disagree. The state court of appeals specifically held that the admission of the hearsay statements under Ohio Evidence Rule 807 did not violate the Confrontation Clause, as the Ohio Supreme Court had already held that Rule 807 comported with the Confrontation Clause in *State v. Storch*, 612 N.E.2d 305. The state court therefore fully addressed Petitioner's right to confrontation claim and AEDPA applies.

Petitioner does not claim that the state court unreasonably applied clearly established federal law; he argues only that the state court decision was contrary to clearly established federal law. A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "A legal doctrine is not 'clearly established Federal law, as determined by the Supreme Court' unless it is based on 'holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision.'" *Jamrog*, 414 F.3d at 591 (quoting *Williams*, 529 U.S. at 412).

### 3.        Analysis

No clearly established federal law requires that, in order to satisfy the Confrontation Clause, a declarant must be unavailable before the hearsay statements of an alleged child victim may be admitted under a non-firmly rooted hearsay exception.[5] Thus, Petitioner may not attack the state court decision based on the availability of D.S. to testify.

### a.        Legal Framework

The Sixth Amendment, in part, states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. While the Confrontation Clause could be interpreted literally to preclude all hearsay statements, Supreme Court precedent demonstrates that this is not the case.

In *Ohio v. Roberts*,[6] the defendant was arrested for forgery of a check in the name of Bernard Isaacs, and for possession of stolen credit cards in the names of Bernard and his wife Amy. 448 U.S. at 58. The defendant contended that the Isaacs' daughter, Anita, with whom he was acquainted, gave him her parents' checkbook and credit cards so that he could use them. *Id.* at 59. At a preliminary hearing, before the defendant was even indicted, defense counsel called Anita as a witness. *Id.* at 58. Anita testified that she knew the defendant, and that she had permitted him to stay at her apartment for several days. *Id.* She denied, however, giving the defendant her parents' checkbook and credit cards so that he could use them. *Id.*

A state grand jury indicted the defendant for forgery, receiving stolen property, and heroin possession. *Id.* In preparation for trial, the prosecution issued five subpoenas for Anita at her parents' residence. *Id.* at 59. She did not respond to these subpoenas and she did not appear at trial. *Id.* At trial, the defendant testified that Anita had given him the checkbook and the credit cards so that he could use them. *Id.* The state then offered Anita's previous testimony in rebuttal. *Id.* Relying on the Confrontation Clause, the defense objected, and the state trial court conducted a *voir dire* hearing. *Id.* Anita's mother, Amy, testified that Anita had gone to Tucson, Arizona shortly after the preliminary hearing. *Id.* at 59-60. She testified that no one knew where Anita was. *Id.* at 60. The state trial court admitted the hearsay statements of Anita, and the defendant was convicted on all counts. *Id.*

---

[5] Firmly rooted hearsay exceptions are those that "rest upon such solid foundations that admission of virtually any evidence within them comports with the substance of constitutional protection." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) (internal quotation marks and citation omitted). "Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Idaho v. Wright*, 497 U.S. 805, 817 (1990). "This standard is designed to allow the introduction of statements falling within a category of hearsay whose conditions have proved over time to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath and cross-examination at a trial." *Lilly v. Virginia*, 527 U.S. 116, 126 (1999) (internal quotation marks and citation omitted). Examples of firmly rooted hearsay exceptions are (1) spontaneous declarations, *White v. Illinois*, 502 U.S. 346, 357 (1992); (2) statements made for medical treatment, *id.*; (3) co-conspirator statements, *Bourjaily v. United States*, 483 U.S. 171, 183 (1987); (4) voluntary admissions used against the declarant, *Lilly*, 527 U.S. at 127.

All other hearsay exceptions that do not have this longstanding recognition of reliability are non-firmly rooted hearsay exceptions. Neither party argues that Ohio Evidence Rule 807 is a firmly rooted hearsay exception, and with good reason: the state adopted the rule in 1991. Moreover, the rule is not analogous to any of the firmly rooted hearsay exceptions. Thus, Ohio Evidence Rule 807 is a non-firmly rooted hearsay exception.

[6] While *Ohio v. Roberts* has been partially overruled by *Crawford v. Washington*, 541 U.S. 36 (2004), it is still relevant law in the instant case, as Petitioner's sentence became final before *Crawford*, and Petitioner does not argue that *Crawford* applies retroactively.

The Supreme Court held that the admission of the hearsay evidence was not error. The Court first addressed the requirements that the Confrontation Clause placed on hearsay statements:

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. . . .
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule.

*Id.* at 65 (internal quotation marks and citations omitted). With respect to unavailability, the Court noted that "[a] demonstration of unavailability is not always required. In *Dutton v. Evans* 400 U.S. 74 . . . (1970), for example, the Court found that the utility of trial confrontation was so remote that it did not require the prosecution to produce a seemingly available witness." *Id.* at 65 n.7. With respect to trustworthiness, the Court stated, "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66. The Court found that the circumstances surrounding Anita's testimony at the preliminary hearing indicated trustworthiness, and that Anita was unavailable, so that the admission of the hearsay statements did not violate the Confrontation Clause. *Id.* at 73, 77.

In *United States v. Inadi*, 475 U.S. 387 (1986), the Supreme Court abrogated the unavailability requirement of *Roberts*. There, the defendant was indicted for conspiracy to manufacture and distribute methamphetamines. *Id.* at 388-89. At trial, the prosecution sought to introduce evidence of taped conversations of the other co-conspirators, who were not indicted. *Id.* at 390. The district court found that the hearsay statements of the co-conspirators were admissible under Federal Rule of Evidence 801, as they were statements made during the course and in the furtherance of the conspiracy. *Id.* The defendant objected on Confrontation Clause grounds, claiming "that the statements were inadmissible absent a showing that the declarants were unavailable." *Id.* The prosecution subpoenaed one of the co-conspirators ("Lazaro"), but he failed to appear. *Id.* Nonetheless, the district court admitted the statements based on Federal Rule of Evidence 801. *Id.* at 391.

The Supreme Court held that the evidence was properly admitted, despite the prosecution's failure to prove that Lazaro was unavailable. The Court explained that while language in *Roberts* could be read to support the proposition that a party must prove a declarant's unavailability as a prerequisite for the admission of *any* hearsay statement,

> *Roberts* should not be read as an abstract answer to questions not presented in that case, but rather as a resolution of the issue the Court said it was examining: the constitutional propriety of the introduction in evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent state criminal trial.
>
> . . .
>
> *Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts. All of these indicate that *Roberts* simply reaffirmed a

longstanding rule . . . that applies unavailability analysis to prior testimony. *Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable.

*Id.* at 392-94 (internal quotation marks and citation omitted).

The Court found that the unavailability rule, while logical in the context of prior testimony, was inapplicable to the hearsay statement of a co-conspirator. With respect to prior testimony, the Court stated that prior testimony was often merely a weaker substitute for live testimony at trial. *Id.* at 394. "When two versions of the same evidence are available, longstanding principles of the law of hearsay, applicable as well to Confrontation Clause analysis, favor the better evidence." *Id.* The hearsay statements of a co-conspirator, however, could not be adequately replaced by live testimony:

> Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. . . . Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand.
>
> . . .
>
> [C]o-conspirator statements derive much of their value from the fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence. Under these circumstances, only clear folly would dictate an across-the-board policy of doing without such statements.

*Id.* at 395-96 (internal quotation marks and citation omitted).

The Court continued and explained why a universal unavailability rule would have little benefit. First, the rule would not be a "better evidence" rule, as it would exclude evidence only when the prosecution failed to produce an available declarant. *Id.* at 396. Second, key witnesses at a trial would have already been subpoenaed, thus causing the rule to be relevant only to witnesses with marginal information. *Id.* at 397. The Court then found that the burdens placed on the prosecution by such a rule would be great, as the prosecution would be responsible for keeping abreast of all of the movements of the declarants. *Id.* at 399. The Court concluded that the unavailability rule was inapplicable to co-conspirator hearsay statements. *Id.* at 400.

In *Idaho v. Wright*, 497 U.S. 805, the Supreme Court addressed Confrontation Clause requirements in the context of the hearsay statements of an alleged child victim of sexual abuse. The defendant was the mother of the two alleged victims of abuse, who were two and one-half years old ("younger daughter") and five and one-half years old ("older daughter") at the time the defendant was charged. *Id.* at 809. The allegations were that the defendant had held down her daughters while her boyfriend raped them. After allegations of abuse had surfaced, a doctor examined the younger daughter. *Id.* The doctor found strong evidence of sexual abuse of the younger daughter. *Id.* The case revolved around certain statements elicited by the doctor from the younger daughter.[7] *Id.* at 810-11. Over the objection of the defendant, the doctor testified as to the hearsay statements of the younger daughter, as the state trial court found that they fell within the residual hearsay exception

---

[7] The content of these statements will be discussed, *infra*, when we address the issue of particularized guarantees of trustworthiness.

of the state. *Id.* at 811-12. The state trial court found that the younger daughter was incapable of communicating to the jury. *Id.* at 809.

The Supreme Court made no finding as to whether the unavailability rule would apply to the younger daughter's hearsay statements:

> Applying the *Roberts* approach to this case, we first note that this case does not raise the question whether, before a child's out-of-court statements are admitted, the Confrontation Clause requires the prosecution to show that a child witness is unavailable at trial–and, if so, what that showing requires. The trial court in this case found that respondent's younger daughter was incapable of communicating with the jury, and defense counsel agreed. . . . For purposes of deciding this case, we assume without deciding that, to the extent the unavailability requirement applies in this case, the younger daughter was an unavailable witness within the meaning of the Confrontation Clause.

*Id.* at 815-16. The Supreme Court thus did not address whether the unavailability rule applied to an alleged child victim's hearsay statements when those statements were admitted under a non-firmly rooted hearsay exception.

In *White v. Illinois*, 502 U.S. 346, the Supreme Court again addressed hearsay statements and the Confrontation Clause in the context of an alleged child victim of sexual abuse. There the evidence showed that in the early morning hours of April 16, 1988, the defendant sexually attacked S.G., a four-year old girl, in S.G.'s home. *Id.* at 349. S.G.'s babysitter heard S.G.'s screams and went to her room, where he saw the defendant leave the room. *Id.* The babysitter knew the defendant because the defendant was a friend of S.G.'s mother. *Id.* The babysitter asked S.G. what had happened, and S.G. stated that the defendant had choked her, threatened her, and had touched her inappropriately. *Id.* S.G.'s mother came home soon thereafter and asked S.G. what had happened. S.G. repeated what she had told the babysitter earlier. *Id.* The mother called the police, and a police officer questioned S.G. *Id.* at 349-50. S.G. repeated the same story she had told the babysitter and her mother. *Id.* at 350. S.G. was then taken to the hospital, where she was examined by a nurse and then a doctor. *Id.* S.G. told the nurse and the doctor the same story she had told to the other individuals. *Id.*

At trial, S.G. did not testify. The prosecution twice attempted to call her as a witness, but she "experienced emotional difficulty" and did not testify. *Id.* Over the defendant's objection, the state trial court admitted S.G.'s hearsay statements to the babysitter, the mother, and the police officer under the spontaneous declaration exception. *Id.* Over the defendant's objection, the state trial court admitted S.G.'s hearsay statements to the nurse and the doctor under both the spontaneous declaration exception and the exception for statements made in the course of medical treatment. *Id.* at 350-51.

The Supreme Court affirmed the admission of all of the statements. The defendant, relying on *Roberts*, argued that the Confrontation Clause required that the declarant be unavailable before the hearsay statements could be admitted. *Id.* at 353. Echoing its analysis in *Inadi*, the Supreme Court found, "*Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." *Id.* at 354 (citation omitted). The Supreme Court found that the circumstances that support the trustworthiness of a spontaneous declaration or a statement in the course of medical treatment "cannot be recaptured even by later in-court testimony." *Id.* at 355-56. Live testimony could not replicate the excitement that causes a spontaneous declaration, nor could it replicate a medical setting, where a false statement could cause misdiagnosis or mistreatment. *Id.* at 356.

The Supreme Court concluded that when a hearsay statement "has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *Id.* at 356. The Supreme Court rejected the defendant's reliance on *Coy v. Iowa*, 487 U.S. 1012 (1988), and *Maryland v. Craig*, 497 U.S. 836 (1990). The Supreme Court explained that those cases involved in-court procedures where the alleged child victim actually testified at trial; in *Coy*, the witness testified behind a screen, and in *Craig*, the witness testified via closed circuit television. *Id.* at 357. In those two cases, the Supreme Court required the prosecution to prove the necessity of the procedure to "avert a risk of harm to the child." *Id.* The defendant argued that the hearsay statements of an alleged child victim should be admitted only when the prosecution makes a showing of necessity, *i.e.*, testifying would create a risk of harm to the witness. *Id.* The Supreme Court disagreed, finding *Coy* and *Craig* inapplicable to out-of-court statements. *Id.* at 358.

### b.          Application to This Case

There is no clearly established federal law that requires an alleged child victim to be unavailable before his hearsay statements may be admitted under a hearsay exception that is not firmly rooted. Petitioner relies primarily on *Roberts*, claiming that the Confrontation Clause requires a declarant to be unavailable before the admission of the declarant's hearsay statements. Petitioner fails to recognize that the Supreme Court has twice limited the unavailability rule in *Roberts*, in both *Inadi* and *White*, to hearsay statements made in a prior judicial proceeding. Of most significance, the Supreme Court proclaimed in *White* that "*Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry *only* when the challenged out-of-court statements were made in the course of a prior judicial proceeding." 502 U.S. at 354 (citation omitted) (emphasis supplied). We acknowledge that in *Wright*, the Supreme Court seemed to use *Roberts* as a general framework in discussing hearsay statements under the Confrontation Clause; however, the Supreme Court followed *Wright* with the previously-cited language in *White*, which clearly limited the *Roberts* unavailability analysis to hearsay statements made in a prior judicial proceeding. To the extent friction exists between *Wright*, *Inadi*, and *White*, such friction demonstrates that there is no clearly established federal law as to an unavailability rule for the hearsay statement of an alleged child victim under a hearsay exception that is not firmly rooted.

As explained above, Petitioner may rely only on the holdings of Supreme Court cases to demonstrate clearly established federal law. In our view, the Supreme Court held the following:

(1)      In *Ohio v. Roberts*, the Supreme Court held that the admission of hearsay statements made in prior judicial proceedings was dependent upon the unavailability of the declarant.

(2)      In *United States v. Inadi*, the Supreme Court held that the admission of a co-conspirator's hearsay statement was not dependent upon the unavailability of the declarant.

(3)      In *Idaho v. Wright*, the Supreme Court made no holding as to whether the unavailability of the declarant was a prerequisite to the admission of hearsay statements of an alleged child victim under a non-firmly rooted hearsay exception.

(4)      In *White v. Illinois*, the Supreme Court held that the admission of hearsay statements of an alleged child victim under a firmly rooted hearsay exception was not dependent upon the unavailability of the declarant.

No Supreme Court holding clearly establishes the applicability of an unavailability rule in this case. This is not a situation where "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or [where] the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. The Supreme Court has not reached a conclusion as to an unavailability rule for the admission of hearsay statements of an alleged child victim under a non-firmly rooted hearsay exception; in fact, the

Supreme Court explicitly left this exact issue open in *Wright*. Moreover, *White* contained unambiguous direction from the Supreme Court to apply the unavailability analysis only with hearsay statements made in prior judicial proceedings. We therefore hold that the admission of D.S.'s hearsay statements, despite the fact that D.S. was technically not unavailable, was not contrary to clearly established federal law.

Our decision today is further grounded in a prior decision of this Court. In *Bugh v. Mitchell*, this Court found, on post-AEDPA habeas review, that the *Roberts* unavailability analysis was limited to hearsay statements made in prior judicial proceedings. 329 F.3d 496, 507 n.3 (6th Cir. 2003).

To the extent Petitioner relies on *Coy* and *Craig* for the proposition that the prosecution must establish necessity before substituting D.S.'s hearsay statements for D.S.'s testimony, we agree with the district court that the Supreme Court rejected this exact position in *White*.

**B.      THE STATE COURT'S DECISION TO ADMIT HEARSAY EVIDENCE WAS NOT CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW WHEN CONSIDERING THE PARTICULARIZED GUARANTEES OF TRUSTWORTHINESS OF THE HEARSAY EVIDENCE**

**1.      Preservation of the Issue**

We agree with the district court's holding that Petitioner fairly presented his right to confrontation claim to the state courts.

**2.      Standard of Review**

The appropriate standard of review is set out above.

**3.      Analysis**

D.S.'s hearsay statements were characterized by particularized guarantees of trustworthiness, as defined by the Supreme Court. As a result, the admission of D.S.'s hearsay statements was not contrary to clearly established federal law.

**a.      Legal Framework**

As explained above, in *Ohio v. Roberts*, the Supreme Court set out a two-step Confrontation Clause analysis for hearsay statements. The first step, the unavailability of the declarant, has been the subject of continued abrogation and qualification. *See supra*. The second step, the trustworthiness of the hearsay statements, has not been placed into doubt, outside of *Crawford*. In *Roberts*, the Court observed that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." 448 U.S. at 66.

In *Idaho v. Wright*, the Supreme Court explained what the particularized guarantees of trustworthiness encompassed in the context of an alleged child victim declarant. In that case, the alleged child victim was taken to a doctor. 497 U.S. at 809-10. Over the defendant's objection, the doctor testified at trial as to statements made by the alleged child victim. *Id.* at 810. The trial court admitted the hearsay statements under the residual hearsay exception. *Id.* at 811-12. The doctor testified that he asked the child the following questions: "Do you play with your daddy? Does daddy play with you? Does daddy touch you with his pee-pee? Do you touch his pee-pee?" *Id.* (quotation marks omitted). The doctor testified that the child said yes to the question, "Does daddy touch you with his pee-pee," and the child did not respond to the question, "Do you touch his pee-pee." *Id.*

at 811. After this line of questioning, the child volunteered the statement that daddy engaged in such conduct with her older sister on a more frequent basis. *Id.*

The Supreme Court held that the hearsay statements were inadmissible. The Court reiterated the rule in *Roberts* that a hearsay statement must be trustworthy in order to satisfy the Confrontation Clause. *Id.* at 816. The hearsay statement must fall under a firmly rooted hearsay exception, or it must have particularized guarantees of trustworthiness. *Id.* (citation omitted). The Court stated that a hearsay statement that did not fall under a firmly rooted hearsay exception was presumptively unreliable. *Id.* at 818 (citation omitted). In the case of such a hearsay statement, the party seeking admission must prove particularized guarantees of trustworthiness. *Id.* at 819. The particularized guarantees of trustworthiness must be demonstrated through the totality of the circumstances. Moreover, the particularized guarantees of trustworthiness must derive from the surrounding circumstances of the hearsay statement. *Id.* at 819-20 ("[B]ut we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief."). Thus, evidence corroborating the hearsay statement may not be considered a particularized guarantee of trustworthiness: "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822.

For hearsay statements made by an alleged child victim of sexual abuse, the Supreme Court listed the following factors as particularized guarantees of trustworthiness: (1) spontaneity; (2) consistent repetition; (3) the mental state of the declarant; (4) the use of terminology unexpected of a child of similar age; and (5) the lack of a motive to fabricate.[8] *Id.* at 821-22.

Armed with these principles, the Supreme Court held that the hearsay statements of the child to the doctor were inadmissible. The statements were admitted under the residual hearsay exception, not a firmly rooted hearsay exception. *Id.* at 817. The Court found that the questions posed by the doctor were suggestive and leading, and the responses were thus unreliable. *Id.* at 826. As to the statement later volunteered by the child concerning her older sister, the Court found that while the spontaneity of the statement suggested reliability, ultimately the spontaneity of the statement could have been influenced by the preceding suggestive questioning. *Id.* at 826-27.

### b.          Application to This Case

We begin with the presumption that D.S.'s hearsay statements are inadmissible, as they do not fall under a firmly rooted hearsay exception. With respect to spontaneity, we conclude that the state court's finding that all of the statements had a degree of spontaneity and were not the result of suggestion is not contrary to clearly established federal law. When both Aunt Sue and Cousin Cindy, on two separate occasions, questioned D.S. as to why he was playing with his penis, he responded that Petitioner did so. When Cindy asked what else Petitioner did, D.S. responded that Petitioner kissed his penis and played with his anus. Unlike the facts in *Wright*, the questions posed by Cousin Cindy were not leading or suggestive; in fact, Cousin Cindy testified that she was shocked at D.S.'s response. With respect to D.S.'s statements to Lorin, Lorin testified that, on October 5, 1999, after Aunt Sue had informed him of Petitioner's possible abuse of D.S., Lorin asked D.S. if anyone was touching him inappropriately. D.S. replied that Petitioner had been doing so. Lorin asked what exactly Petitioner did, and D.S. replied that Petitioner made D.S. perform oral sex on Petitioner, and that Petitioner would perform oral sex on D.S. In no way did Lorin imply, suggest, or otherwise lead D.S. to name Petitioner as the perpetrator, nor did he lead D.S. to specify the conduct involved. Moreover, Lorin testified that after October 5, 1999, D.S. would make spontaneous statements about Petitioner's conduct. With respect to D.S.'s statements to Lisa, the

---

[8]These factors are listed under Ohio Evidence Rule 807 and were considered by the state courts.

record is unclear as to her conversation with D.S. on October 5, 1999, although Lisa testified that the conversation duplicated Lorin's conversation with D.S.; however, Petitioner points to no evidence that Lisa was suggestive or leading in that conversation. Lisa further testified that after October 5, 1999, D.S. would make spontaneous statements to her about Petitioner concerning the abuse. With respect to D.S.'s statements to the investigating detective, the detective testified that she asked D.S. if anyone had touched his penis, and D.S. replied that Petitioner had done so. The state court's finding that this question was not leading or suggestive is not contrary to clearly established federal law. The detective's question of whether D.S. touched Petitioner's penis, however, was leading in the same way the questions posed by the doctor in *Wright* were leading; the answer to the question was embedded in the question itself, so that D.S. only had to respond "yes." The detective's question of whether D.S. had failed to mention anything, to which D.S. explained that the sexual abuse involved oral sex, was not leading. While the detective already knew from Lorin and Lisa that the abuse did in fact involve oral sex, the detective did not suggest this answer in her question.

With respect to consistent repetition, the record shows that D.S. recounted the same facts concerning the abuse he suffered at the hands of Petitioner. In 1997, D.S. told Cousin Cindy that Petitioner performed oral sex on D.S. On October 5, 1999, D.S. told essentially the same story to his father, his mother, and the investigating detective. In our view, the fact that D.S. told the same story more than two years after his statements to Cousin Cindy especially supports the reliability of D.S.'s statements.

With respect to the mental state of D.S., most of D.S.'s statements were not made under stress, excitement, or similar mental states that would lend reliability to those statements. The only possible situation where D.S.'s mental state may have been a factor was on October 5, 1999, when Lorin asked D.S. whether anyone had touched him inappropriately. D.S. appeared as if he was about to cry, and he answered that Petitioner had touched him. Lorin then asked what Petitioner did, and D.S. described the nature of the abuse. It appears that D.S. answered these questions in an emotional state, so as to decrease the likelihood of fabrication.

With respect to use of terminology unexpected of a child of similar age, D.S.'s description of the oral sex involved in the abuse is strong evidence as to the reliability of his statements. When D.S. was three years old, he told Cousin Cindy that Petitioner performed oral sex on D.S. and that Petitioner played with D.S.'s anus. When D.S. was five years old, D.S. told his father, mother, and the investigating detective that Petitioner made D.S. perform oral sex on Petitioner and that Petitioner performed oral sex on D.S. It is extremely unlikely that a child so young even has an inkling as to the concept of oral sex, let alone knowledge sufficient to concoct a falsehood concerning oral sex.

With respect to the lack of a motive to fabricate the statements, there is nothing in the record that suggests any animosity or any other reason D.S. would fabricate the statements about Petitioner. Indeed, D.S. "indicated that he liked 'Uncle Troy' when he was not made to touch Troy or when Troy did not touch him." (J.A. at 1006.)

When viewed in the totality of the circumstances, the factors are sufficient to establish particularized guarantees of trustworthiness as to D.S.'s statements to overcome the presumption of the inadmissibility of those statements. The manner in which the statements were elicited, the consistency of the statements, the use of terminology unexpected of such a young child, and the lack of a motive to fabricate the statements all indicate that the statements were reliable. At most, D.S.'s response to the detective's question of whether D.S. touched Petitioner's penis was unreliable and inadmissible, as the question was leading; however, the improper admission of this statement was harmless, when considering the extent of the reliable statements properly admitted.

For the foregoing reasons, we **AFFIRM** the order of the district court.