NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 06a0559n.06
Filed: August 4, 2006

**No. 04-2493**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FREDERICK DANIELS,

     Petitioner-Appellant,

v.

BLAINE LAFLER,

     Respondent-Appellee.

                                   /

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**BEFORE:**    **MOORE, COLE, and CLAY, Circuit Judges.**

     **CLAY, Circuit Judge.** Petitioner Frederick Daniels appeals the November 3, 2004 order of the United States District Court for the Eastern District of Michigan denying Petitioner's application for habeas relief pursuant to 28 U.S.C. § 2254. Petitioner is currently incarcerated in Michigan state prison after being found guilty in a bench trial of two counts of first-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520b(1)(e). For the following reasons, we **AFFIRM** the order of the district court.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

The state of Michigan charged Petitioner with four counts of first-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520b(1)(e), and one count of possession of a firearm at the time of the commission or attempted commission of a felony, in violation of Mich. Comp. Laws § 750.227b. At a bench trial, Petitioner was tried and convicted of two counts of first-degree criminal sexual conduct but was acquitted of the other three counts. The state trial court sentenced Petitioner to 160 to 320 months imprisonment, inasmuch as Petitioner was a third habitual offender under Mich. Comp. Laws § 769.11.

Petitioner filed a motion for a new trial, which the state trial court denied. Petitioner appealed his conviction to the state court of appeals. The court affirmed the state trial court's decision for the most part, but remanded the case to the state trial court to make additional findings to clarify certain inconsistencies and confusion in the state trial court's decision. *People v. Daniels*, No. 223712, 2001 WL 1565069, at *12-13 (Mich. Ct. App. Dec. 7, 2001) (unpublished decision). On remand, the state trial court clarified its previous decision, and the state court of appeals affirmed in full. *People v. Daniels*, No. 223712, 2002 WL 522829, at *1-2 (Mich Ct. App. Apr. 5, 2002) (unpublished decision). Petitioner applied for leave to appeal the decision to the state supreme court, and the state supreme court denied the application. *People v. Daniels*, 655 N.W.2d 555 (Mich. 2002).

On December 8, 2003, Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 2254. Petitioner

asserted six grounds of relief: (1) the erroneous admission of impeachment evidence against a defense witness; (2) the erroneous admission of hearsay statements made by the victim to the victim's mother; (3) the state trial court's disbelief of Petitioner's testimony; (4) the state trial court's failure to properly adhere to the reasonable doubt standard; (5) the state trial court's inconsistent findings with respect to acquitting Petitioner of the firearm charge but convicting Petitioner of two counts of first-degree criminal sexual conduct; and (6) the state court of appeals' decision to affirm the state trial court's decision after remand, which was based on inconsistent and inadequate findings of fact.

On November 3, 2004, the district court denied Petitioner's application for habeas relief on all grounds. Petitioner timely filed a notice of appeal.

## B.    FACTS

The following facts were found by the state court of appeals. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court must presume the factual findings of the state court to be correct, unless the petitioner rebuts such findings with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In the instant case, Petitioner has not rebutted the state court's factual findings with clear and convincing evidence.

> According to her testimony at trial, on Friday, October 30, 1998, the victim left her job at K-Mart, after an eight-hour shift, and drove to her boyfriend's house at approximately 8:30 p.m. Not finding her boyfriend at home, the victim drove to her own home located at 19445 Justine Street, Detroit. Upon arriving home, the victim went upstairs and began to watch television. At approximately 9:00 p.m., the victim heard a persistent knock at her front door and, after procrastinating for a minute, she went downstairs and asked, "who is it?" The victim testified that she heard someone say, "'It's Fred . . . . Fred from across the street.'" The victim looked out her window and saw Daniels standing on her front porch. The victim testified that Daniels said to her, "'[c]ould you give Rick [the victim's sister's boyfriend] some

3

money for me?'" . . . "[a]nd I said, I was like, yes." Daniels then asked for Rick's number, and if he could use the victim's telephone. The victim said, "yes," and went to retrieve the telephone from her room, leaving Daniels outside on the front porch. When the victim returned, she found Daniels in her living room, and she noticed that the front door was closed. The victim did not say anything to Daniels at this point because she was "shocked" that he had entered her home uninvited. The victim handed Daniels the telephone and, according to the victim, Daniels "pretended" to dial some numbers for approximately two to three minutes. Daniels then put the telephone down, removed a gun from his rear pocket, and told the victim that he was going to rape her. The victim continued her testimony as follows:

Q. Did he give you--after he told you that did he give you any instructions . . . ?
A. He tells me to go in the back room and take off all my clothes.

The victim testified that she removed her clothes as ordered, while Daniels walked "back and forth smoking on some crack." Daniels told the victim to get a blanket off the bed and lay on the floor in the other room. The victim stated that Daniels told her to "'play with herself--get wet for him.'" Daniels, still with the gun in his hand, ordered the victim into the bathroom and, while watching her, told her to wash herself. After the victim washed herself, Daniels and the victim went upstairs to her bedroom.

According to the victim, with the gun still in his possession, Daniels ordered her to lay on the bed and to "play with herself" again. Daniels then told the victim that his wife was in a serious car accident, that his baby was dead, and that his wife and other two children were in the hospital. On direct-examination by the prosecution, the victim continued her testimony:

Q. Okay. What happens, what happens after that, what happens then?
A. He performed oral sex on me.
Q. Okay. I'm going to need a definition of that. You said he performed--did a part of his body touch your body?
A. Yes, . . . [h]e sticks his tongue into my vagina.
Q. Okay. Did you want that to happen?
A. No.
Q. When he did that was he clothed at the time?
A. Yes . . . .

* * *

Q. Okay. What position did he have you in. Tell the [c]ourt what position he had you in?
A. My knees on the bed with my face like in the mattress.
Q. After he performed oral sex or cunnilingus on you what happens next . . . ?
A. He gets up. He takes off all his clothes and he comes and gets on

4

the bed and makes me perform oral sex on him and he performed oral sex on me.

Q. What did you, what did you have to do with him?

A. I had to stick his penis in my mouth.

Q. Okay. While you were doing that what did he do to you?

A. He put his tongue inside my vagina.

Q. Okay. Did you know where the gun was when this happened?

A. I'm not sure.

Q. All right. Did you want this to happen?

A. No.

Q. Did any other, do you remember any other sex acts taking place upstairs?

A. He had stuck his finger in my butt and asked me had I ever had sex in the butt before.

Q. Did he do anything to make this a little easier, the insertion of the finger into the rectum?

A. Yeah, he put Vaseline on my butt . . . .

* * *

Q. Did he, did he in fact place his penis inside your vagina?

A. Yes; to my knowledge, yes.

The victim testified that Daniels continued to smoke crack while at her home and offered her some of the drug, which she refused. Daniels told the victim to get up and put her clothes on. Daniels then instructed the victim to "wipe down" specific items and fixtures in the house with Tilex. The victim testified that, during this time, Daniels was still in possession of the gun, and told her that if she told anyone about what happened he would kill her and her family.

The victim testified that she and Daniels then left her house in her vehicle, with Daniels in the passenger's seat; the victim was under the misapprehension that Daniels wanted to get something to eat, but she stated that she "ended up taking him to go get some weed . . . in the Six Mile and Hoover area." The victim testified that Daniels exited the car, taking her car keys with him, and approached several homes in the area in an attempt to purchase marijuana. When asked by the prosecution why she did not flee at that point, the victim responded that she could not run because one of her lungs was removed due to a previous bout with pneumonia, and that she currently is suffering from sickle-cell anemia, which exacerbates her pulmonary deficiency.

According to the victim, after Daniels purchased some marijuana, they returned to her house. Daniels began smoking marijuana, and according to the victim, they were "basically just sitting there" for "a couple of hours." Daniels and the victim again left her house at approximately 4:00 a.m. to 4:45 a.m., purportedly to get something

5

to eat at White Castle, but instead, Daniels had the victim drive to Farwell Park. The victim asked Daniels if he was going to hurt her, to which he replied, "no." According to the victim, a police car suddenly appeared, and Daniels told her to "hurry up and pull off." The victim said she, "pulls off as fast as I can going across a big, ol' field to, I think that's Sunset, and when I get to Sunset and Outer Drive the police was following a little bit, but then they stopped, and then I ask, you know, am I taking you home--I turn down the wrong way on the side of his house and he hurry up and get out and he runs." Shortly thereafter, the victim went to her mother's house at 19409 Justine, Detroit, letting herself in with her own key. The victim stated that she went into the back room and laid down on her brother's futon, and dozed off for a few minutes, until she was awakened by her mother at approximately 7:30 a.m.

The victim's mother testified that in the evening hours of October 30, 1998, after returning from shopping, she went to her daughter's home and unsuccessfully attempted to contact the victim by knocking on her door and telephoning her. While thinking it unusual, because the victim "always lets her know where she is," the mother made several more unsuccessful attempts to contact her daughter. The next morning, the mother awoke and asked her husband who was downstairs, to which he replied with their daughter's name. The mother, thinking it unusual for her daughter to come to the house and lay on the bed, went downstairs and saw the victim "laying flat on my son's bed. And her hands are under her and she has tears coming in her eyes."

The mother testified that she then asked her daughter, "'. . . what's wrong?' And she looked up at me, and I said, '[t]ell me what's wrong,' because she had tears in her eyes . . . [a]nd she told me, she said, 'you promise not to . . .'" At this point in the mother's testimony, Daniels' counsel objected as to hearsay, and oral argument between the prosecution and Daniels' counsel transpired as to the admissibility of statements made by the victim to her mother. The trial court ruled on the objection by stating, "I think that the case law, just not only citing these two cases, but it's pretty clear that in this particular instance questions--that testimony can be related from . . . [the victim]--so the court will hear that testimony." The prosecution's direct examination of the mother continued:

Q. And you asked her what's wrong?
A. Yes.
Q. All right. What did she say to you?
A. She told me, "I've been raped." And she jumps up from the, from the bed.
Q. Did she--before she told you that--did she say anything else to you first?
A. She told me that the man across the street had raped her.

6

Q. Okay.

A. And then she jumped up running around the house. I said, "What do you mean, raped you?" She ran around the house trying to look into all the windows like the man was still outside. And I said, "[w]hat man?" And she said, "[t]he man across the street." And then she kept saying, "[b]e quiet, be quiet, be quiet. He might be around here . . . . He said he was going to kill us all . . . ."

Q. Did the police, did the police come out?

A. Yes, they did.

Officers Kevin Payton and Matthew Closurdo, of the Detroit Police Department, testified that they were dispatched to 19409 Justine, Detroit, at approximately 8:55 a.m., in response to a criminal sexual conduct complaint. Officer Payton testified that, as a result of their investigation, Daniels was identified as the person who sexually assaulted the victim, and was subsequently arrested by Officer Payton for first-degree criminal sexual conduct. Officer Payton stated that during the course of the investigation, he went to Daniels' house, dressed in full uniform, and asked Daniels if his name was Fred, to which Daniels responded, "yes." Officer Payton testified as follows in response to direct examination by the prosecution:

Q. Okay. What happens or what's said next?

A. Next he said, "I was just tricking with her. I didn't touch her...."

* * *

Q. He blurted that out to you?

A. Yes, sir.

Q. You didn't tell him why you were there?

A. No, sir.

Q. You didn't tell him what you wanted to talk to him about?

A. No, sir . . . .

* * *

Q. Okay. When he says that to you, "I was just tricking. I didn't touch her," what do you do?

A. Then I had him step outside and I advised him that he's under arrest.

Q. Okay. Did you tell him at that point what he was under arrest for?

A. No; not at that point . . . .

* * *

Q. Does he say anything more to you when you tell him that he's under arrest?

A. He just continues on with, "I was just tricking with her. I didn't touch her. She's lying."

Shortly after Officer Payton's testimony, the prosecution ended its case-in-chief, and Daniels presented his proofs. Daniels' witness Jemel Lavender, testified that he was the victim's neighbor on October 30, 1998, and that he remembered being outside

7

"on his porch" at approximately 9:00 p.m. to 9:30 p.m. Lavender said that he saw the victim pull "up in front of her house" in a two-door purple Cavalier. Lavender observed the victim have a conversation with Daniels, as both she and Daniels walked toward each other. Lavender continued, testifying as follows in response to direct examination by defense counsel:

Q. Okay. And then they met up; is that correct?
A. Yes.
Q. And then when they met up together did they walk together from there?
A. She was leading. They met up at the sidewalk and she was leading towards her front door with her house keys.
Q. All right. And where was Mr. Daniels as she walked up with her house keys in her hand?
A. Following behind her.
Q. And what happened next?
A. She opened the door . . . .

* * *

Q. And after she opened the door what did you see happen?
A. Fred followed behind.
Q. Inside--did they both go inside the house?
A. Yes

* * *

Q. And did she open the door for him to come in or he just followed her in? How--what did you see?
A. She opened the door for Fred to come in . . . .

* * *

Q. Later on, hour, two hours later, did you ever see -
A. About a half hour or hour later, yeah, they both came out.
Q. You said--who are the people you are referring to?
A. Excuse me?
Q. The same two people?
A. Yes; same two.
Q. Okay. And where--what door did they come out of the house?
A. She entered out the front and--exited out the front and Fred left out the side.
Q. So, she came out the front door of her house.
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. And Mr. Daniels came out the side door?
A. Yes.

8

Q. Is that at the same time?
A. Yes . . . .

* * *

Q. All right. Just tell us exactly what you saw.
A. She walked around the driver's side and they got in the car.
Q. All right. Did you ever see a gun in Mr. Daniels' hands that time?
A. Never . . . .

* * *

Q. Did you, did you see anything that would--that looked unusual on her face?
A. No; not at all.

Daniels then called George Dickerson to testify. Dickerson, a neighbor, testified that, on the morning in question, he was on his porch getting ready to leave for work when he observed a purple car "pull up" shortly before 5:00 a.m. Dickerson said he saw a woman, whom he later identified as the victim, driving the car. Dickerson continued, stating, "[a]ll I heard was voices. All I heard was an argument going on." Dickerson testified as follows in response to direct-examination by defense counsel:

Q. All right. Now, did you hear what was being said?
A. Something said to the effect: "Give me my money and get out, get out of my car."
Q. Was that the woman that was saying that?
A. Yeah.
Q. Was that the woman inside the car?
A. Yes.
Q. Was that the woman who you later found out to be was [the victim]?
A. Yeah.
Q. All right. Did you hear anybody say anything in response?
A. Yeah, drop me off at my house.
Q. All right. Do you know who was saying that?
A. Yeah, I saw who it was when the guy got out.
Q. Who was that?
A. It was Fred.
Q. Is that Mr. Daniels here in court?
A. Yes . . . .

* * *

Q. Then what did you see?
A. I saw him go in the house and I kept going to work to the bus stop.
Q. Okay. And what house did you see Mr. Daniels go into?
A. He went into his own house.

The prosecution, during cross-examination, asked Dickerson, "[y]ou do have a conviction, though, don't you, sir, for -." Daniels' counsel objected. The trial court

interceded, stating, "[c]onvictions don't matter, Mr. Hutting, if they're not based on theft, dishonesty or false statement and within the last ten years; right?" The prosecution responded, "[i]f he wasn't discharged from probation or parole within the last [ten] years; yes. Okay." The trial court then stated, "[a]nd deals with truth, voracity [sic] or false statement." The prosecution interjected, "[h]ow about unarmed robbery?" The trial court responded, "[e]lement of theft; right?" The trial court allowed the prosecution to continue its cross-examination of Dickerson:

Q. Were you connected--you have a conviction, do you not, sir, for an unarmed robbery?
A. Yes.
Q. Okay. That conviction was in 1986 and you were discharged from probation in 1991; is that correct?
A. Yeah, something like that.
Q. All right. You got five years probation; right?
A. Yeah.

Daniels' counsel asked that this statement be excluded, to which the trial court replied, "[w]ell it's from the time of parole or probation within [ten] years; so, it's only been eight since the termination of parole or probation, as I understand the rule."

Patricia Harrison, an acquaintance of Daniels, testified that he came to her house on the night in question, and asked her if she had a room for rent, and if she knew where he could get some marijuana. Harrison said that she observed a small, purple car in her driveway when Daniels came to the door, and it was occupied by a female driver. Harrison told Daniels that she did not have any rooms to rent, nor did she have any marijuana for him. On cross-examination by the prosecution, Harrison testified that she could not identify the female driver of the vehicle.

After closing arguments, the trial court rendered its verdict. During its recitation of its findings, the trial court held:

It's strictly based on the testimony of [the victim], . . . this court finds proof beyond a reasonable doubt and I do find, based on her testimony, that I am convinced in count two that there was an act of cunnilingus performed by Mr. Daniels on [the victim] beyond a reasonable doubt and it was not consensual.
I'm even going to find that as in count three there was a non-consensual act of fellatio . . .

* * *

I am not convinced, however, that there was a penetration of the penis in the vagina of [the victim] for count four, but I am convinced that both count one and count two were done by the defendant when a weapon was produced and find that count two and three were

10

committed; that is criminal sexual conduct in the first degree.

I'm not convinced of the felony[-]firearm beyond a reasonable doubt based on the evidence, so I will find Mr. Daniels not guilty of felony[-]firearm; that's the findings of the [c]ourt; that Mr. Daniels is guilty of count two and count three, not guilty of one, four and five.

The trial court later heard oral argument on Daniels' motion for a new trial. Daniels argued that the facts, along with the inconsistencies and confusing articulation of the trial court's recitation of its findings, did not support the trial court's verdict that there was an assault within the meaning of the statute, because the "aggravating circumstances applicable to this case was possession of a firearm as to which the trial court specifically found in favor of defendant . . . ." The trial court ruled:

The thing, though, however in assessing it, as I remember at the time, the prosecution had to prove felony[-]firearm; that in fact it was a gun. And for the particular offense, I could find that there was a gun or that there was something that was formed and fashioned to reasonably believe the person to have been assaulted that it was a gun[;] it didn't have to be a firearm. And it is on that juncture that I decided the case . . . .

* * *

So I didn't see it as an inconsistency and still don't because in my findings of fact and analyzation [sic] of the felony[-]firearm statute, I would have to be convinced beyond a reasonable doubt that it was a firearm instead of something that was formed or fashioned that could reasonably believe the person so assaulted to conclude that it was a gun . . . .

* * *

You know, to me you either had the gun or you didn't have the gun. But we all realize that sometimes people are trying to justify sentences and therefore do that. But I can assure you that in this particular case the best of my ability that that wasn't done and for that reason I'm going to deny the motion . . . .

*Daniels*, 2001 WL 1565069, at *1-7 (alterations in the original). In a subsequent decision, the state

court of appeals explained the findings of the state trial court on remand:

On remand, the trial court clarified its findings concerning each charge against Daniels. The trial court found that, despite the victim's testimony of digital-anal penetration, contradictory testimony concerning what she reported to the police following the assault left a reasonable doubt regarding Count I. However, the trial

court found the victim's testimony that Daniels had what appeared to be a silver gun and that he performed cunnilingus on her and forced her to perform fellatio on him credible, meriting conviction for Counts II and III. As for Count IV, the trial court found a reasonable doubt regarding whether Daniels actually penetrated the victim. Finally, addressing the felony-firearm charge in Count V, the trial court clarified that the victim's testimony clearly demonstrated that she thought that Daniels had a weapon, which she believed to be a "silver gun." However, the victim was not able to see the alleged gun very well, which led the trial court to find that, though Daniels had a weapon or something that the victim reasonably believed to be a weapon, the prosecutor had not proved beyond a reasonable doubt that this article was a firearm, as the felony-firearm statute requires.

Having had the opportunity to consider the trial court's clarified findings, we see no inconsistency in the trial court's convictions on Counts II and III, but acquittal on Count V. M.C.L. § 750.520b(1)(e) only requires evidence of a weapon or something that reasonably led the victim to believe that it was a weapon. In contrast, felony-firearm entails a defendant carrying or possessing a weapon while committing or attempting to commit a felony. Because "firearm" has a specific statutory definition, not just any weapon or item fashioned similarly to a firearm satisfies the felony-firearm statute. Given the victim's clear testimony that she believed Daniels to have a weapon, the evidence and the trial court's findings supported the two CSC I convictions. However, as the trial court also expressed, there are questions concerning whether the weapon Daniels had was actually a firearm, which demanded acquittal of the felony-firearm charge. Furthermore, any confusion in the trial court's original findings concerning whether it was convicting Daniels of the CSI charges in Count I or Count III is no longer cause for concern given the trial court's explanation of its findings on remand.

*Daniels*, 2002 WL 522829, at *1.

## II. DISCUSSION

## A. THE STATE TRIAL COURT'S ADMISSION OF IMPEACHMENT EVIDENCE

### 1. Preservation of the Issue

As a prerequisite for federal habeas relief from state imprisonment, Petitioner must first exhaust his state court remedies. 28 U.S.C. § 2254(b)(1). Under the exhaustion requirement, Petitioner must first fairly present the "substance" of his federal habeas claim to the state courts, so

that the state judiciary may have the first opportunity to hear the claim. *Lyons v. Stovall*, 188 F.3d 327, 331 (6th Cir. 1999) (citations omitted). Specifically, Petitioner must present both the factual basis and the legal basis for his claim. *Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004) (citation omitted).

Respondent argues that Petitioner failed to exhaust both his impeachment evidence claim and his hearsay evidence claim. Respondent claims that in Petitioner's state appellate brief, Petitioner spent the vast majority of his brief arguing that the admission of the impeachment evidence and the hearsay evidence were violations of Michigan evidentiary law. At the end of both the impeachment and the hearsay sections of his brief, Petitioner included the sentence: "The error was not merely evidentiary. It negatively impacted on defendant's constitutional right to a fair trial." Respondent believes that this statement is insufficient to demonstrate that Petitioner fairly presented his federal habeas claim to the state courts. We disagree.

In *Baldwin v. Reese*, the Supreme Court explained what actions were required on the part of a petitioner to fairly present his federal habeas claim to the state courts:

> A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal."

541 U.S. 27, 32 (2004). In this case, it is undisputed that Petitioner labeled both his impeachment and his hearsay claims as state and federal claims; Petitioner stated that not only were these claims grounded in a misapplication of Michigan evidentiary law, but they were also based on the federal constitutional right of a fair trial. The Supreme Court made clear in *Baldwin* that Petitioner need not recite a specific sequence of words to fulfill the exhaustion requirement, nor is there some sort

13

of threshold requirement whereby Petitioner must dedicate a certain number of words to analysis of federal law. Labeling a claim as a federal claim is sufficient; here, Petitioner definitely placed a federal label on both his impeachment and his hearsay claims by stating that the state trial court's actions deprived him of his federal constitutional right to a fair trial.

Respondent's reliance on *Gray v. Netherland*, 518 U.S. 152 (1996), is misplaced. That case discussed another Supreme Court case, *Anderson v. Harless*, 459 U.S. 4 (1982) (per curiam). In *Anderson*, the petitioner never presented a federal claim to the state courts. *Id.* at 5-6. Instead, the petitioner cited only one state case where the defendant in that case made broad claims of violation of federal due process but the state court decided the case on state law grounds. *Id.* at 6-7. Thus, the only possible reference to a federal claim by the petitioner was the citation of a state case that was decided on state law grounds, but where the defendant in that state case also made a general federal due process claim. The Supreme Court found that such a tenuous reference was not sufficient to satisfy the exhaustion requirement. *Id.* at 7. In marked contrast, Petitioner here directly asserted a federal basis for his claims in his state appellate brief. As stated above, Petitioner must present both the factual and the legal basis of his federal habeas claim to the state courts in order to satisfy the exhaustion requirement. Petitioner asserted that the state trial court erroneously admitted impeachment evidence and hearsay evidence, the factual bases for his claims. Petitioner asserted that the admission of such evidence violated his federal constitutional right to a fair trial, the legal basis of his claims. Petitioner has therefore satisfied the exhaustion requirement.

**2.      Standard of Review**

14

When reviewing the decision of a district court on a petition for habeas relief, this Court reviews the legal conclusions *de novo* and the factual conclusions for clear error. *Stuart v. Wilson*, 442 F.3d 506, 514 (6th Cir. 2006) (citation omitted). That said, because Petitioner's habeas application was filed after the effective date of AEDPA, AEDPA applies. *Id.* (citation omitted). AEDPA requires the federal courts to give substantial deference to the decisions of state courts. Under the strictures of AEDPA, "the federal courts may not grant habeas relief for a state prisoner unless the state court adjudication of his claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 514-15 (quoting 28 U.S.C. § 2254(d)(1)).

Deferential review under AEDPA, however, only applies where the state court has adjudicated a claim on the merits. *Maple v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (citation omitted). "Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply. . . . Instead, this court reviews questions of law and mixed questions of law and fact de novo." *Id.* (internal citations omitted). In this case, the state courts did not address Petitioner's claims that the admission of the impeachment evidence and the hearsay evidence violated his federal constitutional right to a fair trial. As a result, this Court conducts *de novo* review.

15

The district court incorrectly applied the standard of review set out in *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000).[1]  In that case, this Court held that where the state court decides a claim on the merits but does not articulate the reasons for its decision, this Court is

> obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. . . . That independent review, however, is not a full, de novo review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.

*Id.* at 943 (internal citations omitted).  The *Harris* standard, however, only applies where the state court adjudicates a claim on the merits but does not give any reasoning.  In this case, the state court of appeals only reached the merits of Petitioner's state evidentiary claims and never addressed Petitioner's federal claim of deprivation of a fair trial due to the admission of the impeachment evidence and the hearsay evidence.  This is not an instance where the state court adjudicated a claim on the merits but failed to give its reasoning; the state court did not even address Petitioner's federal claims.  The *Harris* standard was therefore inappropriate.

## 3.    Analysis

### a.    Legal Framework

Generally speaking, claims of violation of state law, including state evidentiary error, are not cognizable on a petition for federal habeas corpus relief.  *Stuart*, 442 F.3d at 513 n.3 (quoting *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)).  When, however, a state evidentiary ruling is

---

[1]This Court reviews *de novo* the district court's choice of the proper standard of review. *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 710 (6th Cir. 2000) (citation omitted).

"so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citation omitted).

The question naturally becomes what the inquiry is in deciding whether a state evidentiary ruling was sufficiently egregious as to deny a fair trial. On this issue, the Eighth Circuit has stated:

> We grant habeas relief on a state court evidentiary ruling only "if the alleged error was so conspicuously bad that it fatally infected the trial and rendered it fundamentally unfair." *Troupe v. Groose*, 72 F.3d 75, 76 (8th Cir.1995). "To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial--*i.e.*, that absent the alleged impropriety the verdict probably would have been different." *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir.1995).
>
> In assessing whether this burden has been met, the following are of "particular importance": "the frequency and pervasiveness of the alleged misconduct in the context of the entire trial"; "the weight of the evidence supporting guilt"; and "whether the trial judge gave a cautionary instruction to the jury." *Id.*

*Gee v. Groose*, 110 F.3d 1346, 1350 (8th Cir. 1997). Likewise, the Eleventh Circuit has stated:

> We review state court evidentiary rulings on a petition for habeas corpus to determine only whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial. Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a crucial, critical, highly significant factor in the [defendant's] conviction.

*Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992) (alteration in the original) (internal quotation marks and citations omitted). We agree with the analysis of these circuits.

The state evidentiary rule at issue is Michigan Rule of Evidence 609. This rule allows a party to impeach a witness' credibility with a conviction of a felony crime that involved an element of theft. MRE 609(a)(2). The rule, however, also states that "[e]vidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction

or of the release of the witness from the confinement imposed for that conviction, whichever is the later date." MRE 609(c).

### b. Application to This Case

The state trial court allowed the prosecution to impeach one of Petitioner's witnesses, Dickerson, with a conviction for unarmed robbery. The state court of appeals found that the state trial court erred in admitting this evidence, as more than ten years had passed since the date of the conviction or Dickerson's release from confinement (Dickerson was never imprisoned for the crime but received parole). *Daniels*, 2001 WL 1565069, at *7. The state court of appeals found that this erroneous admission of impeachment evidence was harmless error: "Here, the prosecution's case was so strong that a reasonable trier of fact could not have found to acquit Daniels had the impeachment evidence been suppressed." *Id.* at *8.

The district court found that the erroneous admission of the impeachment evidence was not sufficient to render Petitioner's trial fundamentally unfair so as to warrant habeas relief:

> [T]he Court finds that the admission of Dickerson's prior conviction as impeachment evidence, even if erroneous under state law, did not render Petitioner's trial fundamentally unfair. It is highly doubtful that the trial court sitting as the trier of fact would have been influenced to any significant degree by the fact that Dickerson had a 13-year-old unarmed robbery conviction in evaluating his credibility. Additionally, that conviction only went to Dickerson's general credibility, not to any bias, prejudice, or motive to testify. Further, Petitioner presented additional witnesses, including Jemel Lavender and Patricia Harrison, in support of his defense that the sexual activity was consensual.
> . . . .
>
> In this case, Dickerson's credibility was already called into question by the prosecution on cross-examination. The disputed impeachment evidence was thus somewhat cumulative. Moreover, given the evidence presented at trial, particularly the victim's testimony, any improper impeachment of Dickerson with his unarmed

robbery conviction did not have a substantial or injurious effect or influence on the trial court in determining the verdict. Habeas relief is not warranted on this claim.

(J.A. at 388-89.)

We are inclined to agree with the district court. Dickerson was one of three witnesses Petitioner called to establish that the sexual activity between Petitioner and the victim was consensual. Dickerson testified that he saw Petitioner and the victim arguing about money in a car, thus supporting Petitioner's version of events that Petitioner exchanged money for sex with the victim. The general impeachment of this testimony, with Dickerson's prior conviction for a more than decade old unarmed robbery, was not so egregious as to render Petitioner's trial fundamentally unfair. The impeachment evidence was not "a crucial, critical, highly significant factor' in the [defendant's] conviction." *Singletary*, 952 F.2d at 1296 (alteration in the original). To demonstrate a fundamentally unfair trial, Petitioner must "show that there is a reasonable probability that the error complained of affected the outcome of the trial--*i.e.*, that absent the alleged impropriety the verdict probably would have been different." *Groose*, 110 F.3d at 1350 (internal quotation marks and citation omitted). In our view, the erroneous admission of the impeachment evidence did not affect the outcome of the trial; if the impeachment evidence were excluded, the outcome of the trial in all likelihood would have been the same. There is no indication from the record that had this impeachment evidence not been admitted, the trial court would have so credited Dickerson so as to find Petitioner not guilty of the crimes charged. This is especially true because the prosecution impeached Dickerson with the fact that he had driven to court twice with Petitioner, thus implying that Dickerson and Petitioner were friends. In short, the impeachment evidence was not a significant component in the trial court's calculation of Petitioner's guilt.

**B.**   **THE STATE TRIAL COURT'S ADMISSION OF HEARSAY EVIDENCE UNDER MICHIGAN RULE OF EVIDENCE 803(3)**

**1.**   **Preservation of the Issue**

As explained, *supra*, Petitioner properly exhausted this claim.

**2.**   **Standard of Review**

As explained, *supra*, this Court reviews this claim *de novo*, as the state courts did not address this claim.

**3.**   **Analysis**

**a.**   **Legal Framework**

Generally speaking, claims of violation of state law, including state evidentiary error, are not cognizable on a petition for federal habeas corpus relief. *Stuart*, 442 F.3d at 513 n.3 (quoting *Walker*, 703 F.2d at 962). When, however, a state evidentiary ruling is "so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512 (citation omitted).

The state evidentiary rule at issue is Michigan Rule of Evidence 803(3), which states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> **(3) Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

We note that MRE 803(3) utilizes the exact same language as Federal Rule of Evidence 803(3).

**b.**   **Application to This Case**

20

### 1. Error

The state trial court allowed Jessie Scott, the mother of the victim, to testify as to out of court

statements made by the victim the morning after the alleged assault:

Q:      Okay.  Mrs. Scott, I think when we broke we were at the point where you
        were asking your–you saw tears in your daughter's eyes.

A:      Yes.

Q:      And you asked her what's wrong?

A:      Yes.

Q:      All right.  What did she say to you?

A:      She told me, "I've been raped."  And she jumps up, from the bed.

Q:      Did she–before she told you that–did she say anything else to you first?

A:      She told me that the man across the street had raped her.

Q:      Okay.

A:      And then she jumped up running around the house.  I said, "What you mean,
        raped you?"  She ran around the house trying to look into all the windows
        like the man was still outside.  And I said, "What man?"  And she said, "The
        man across the street."  And then she kept saying, "Be quiet, be quiet, be
        quiet.  He might be around here."  So, I, I told her, I said, "What you mean
        he might be around here?"  "He said he was going to kill us all," if she told.

(J.A. at 242-43.)

The prosecution clearly relied on the statements to prove the truth of the matter asserted in

those statements.  In the introduction to its closing argument, the prosecution stated:

I would submit to this Court that what the complainant, Melissa Scott, testified to
*along with her mother* and along with the officers, all right, *shows that these acts did*

*in fact occur*; that there was nothing consensual about these acts; that Melissa Scott did not want to engage in any way, shape or form with any, any of the acts that the, that the defendant forced her to engage in. *She did in fact report this to her mom.*

(J.A. at 333) (emphasis supplied). In rebuttal argument, the prosecution gave these final statements:

We submit to the Court that Melissa Scott, when she testified here, was not in fact lying, was not in fact making these things up; that the defendant, Mr. Daniels, did in fact to that. Her testimony indicates that. *Her mother's testimony also corroborates that* along with the testimony of the police officers and we would ask the Court to find Mr. Daniels guilty.

(J.A. at 344) (emphasis supplied). It is self-evident that the prosecution offered these statements to prove the truth of the matter asserted, that the declarant was raped, and that Petitioner raped the declarant. The state trial court found, and the state court of appeals and the district court agreed, that the statements were admissible under MRE 803(3) because they were statements of the declarant's state of mind, ostensibly that declarant was scared. We disagree.

We first note that the hearsay statements at issue, that the declarant was raped, and that the man across the street [*i.e.*, Petitioner] had raped the declarant, do not go to state of mind at all. These statements do not reveal anything about the declarant's state of mind. *People v. Roupe*, 389 N.W.2d 449 (Mich. Ct. App. 1986) is instructive in this regard. There, the state court of appeals upheld the exclusion of the hearsay statement that the declarant was looking for money. *Id.* at 477. The statement was offered to prove that the declarant was looking for money and was thus afraid, so as to support the declarant's duress defense. *Id.* The court found its exclusion proper: "In the general form this statement was offered, it had no probative value as to defendant's state of mind and was properly excluded by the trial judge." *Id.* Likewise, the aforementioned hearsay statements are not probative of the declarant's state of mind, as the statements could have just as easily been

made when the declarant was dispassionate as when the declarant was scared. In such a general form, the statements did not speak to the declarant's state of mind.

More importantly, even assuming the hearsay statements at issue were relevant to the declarant's state of mind, their admission was still erroneous. MRE 803(3) allows the admission of hearsay statements that the declarant was in a certain state of mind.[2] MRE 803(3) does not, however, allow the admission of statements as to *why* the declarant was in a certain state of mind. MRE 803(3) specifically disallows the admission of "a statement of memory or belief to prove the fact remembered or believed." For example, in *Duke v. American Olean Tile Co.*, a tort case, the trial court admitted, under MRE 803(3), the statements of the declarant to medical personnel that the declarant "stopped in for a cup of coffee, the floor was wet as he entered the door as his feet went out from under him, and he just couldn't control his fall." 400 N.W.2d 677, 685 (Mich. Ct.

---

[2]This differs from nonhearsay statements that are offered for the purpose of demonstrating the declarant's state of mind. For example, the out of court statement, "I am angry," if offered for the purpose of demonstrating that the declarant was in fact angry, would be hearsay, as it is an out of court statement offered to prove the truth of the matter asserted. Such a statement would be excepted from the general prohibition against the admission of hearsay statements through MRE 803(3). On the other hand, the out of court statement, "John is a two-faced liar," if offered not for the purpose of establishing that John was in fact a two-faced liar, but rather for the purpose of demonstrating that the declarant was angry, would not be hearsay. Such a statement is not offered for the truth of the matter asserted; thus, the statement is not hearsay, so there is no need for the statement to be excepted under MRE 803(3). *See, e.g.*, *People v. Jones*, 579 N.W.2d 82, 88 (Mich. Ct. App. 1998) ("If the statement only indirectly tends to prove a certain state of mind then it is not hearsay because the truth of the assertion and the credibility of the declarant are not relied upon. Rather, the fact that the statement was made, regardless of its truth, is relevant to show the speaker's knowledge, intent, or some other state of mind.").

In the instant case, the statements at issue, that the declarant was raped, and that the man across the street [*i.e.*, Petitioner] had raped the declarant, are not nonhearsay statements offered only to prove the declarant's state of mind. As explained, *supra*, the prosecution utilized the statements to prove the truth of the matter asserted in those statements.

App. 1987). The state court of appeals found that MRE 803(3) did not allow the admission of such statements: "We agree with defendant that only [the declarant's] later statement to hospital personnel that he was in pain was admissible under MRE 803(3), and not his explanation of the circumstances of the accident." *Id.* Likewise, the declarant's statement that she was scared would have been admissible; the statements that she was raped and that Petitioner raped her were inadmissible because they went to the circumstances surrounding why she had a certain state of mind. These statements were plainly statements "of memory or belief to prove the fact remembered or believed." MRE 803(3). As explained, these statements were offered to show that in fact the victim was raped and that Petitioner raped the victim.

As noted above, MRE 803(3) contains the exact same language as Federal Rule of Evidence 803(3). The circuits that have considered the issue are consistent in holding that Federal Rule of Evidence 803(3) does allow the admission of statements as to the declarant's state of mind, but does not allow the admission of statements as to *why* the declarant has said state of mind. *See, e.g.*, *United States v. Samaniego*, 345 F.3d 1280, 1283 (11th Cir. 2003); *United States v. Tome*, 61 F.3d 1446, 1454 (10th Cir. 1995); *United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991); *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987); *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980). In *Cohen*, the trial court excluded hearsay statements made by the defendant that a co-conspirator threatened him; the defendant's defense was duress. *Id.* at 1225. The Fifth Circuit affirmed the exclusion of the hearsay statements, reasoning that such statements did not fall under the hearsay exception of Rule 803(3):

> Appellant seeks to stretch the limited scope of admissibility under F.R.E. 803(3). That rule by its own terms excepts from the ban on hearsay such statements as might

24

have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed. The rule thus permitted the witnesses to relate any out-of-court statements Cohen had made to them to the effect that he was scared, anxious, sad, or in any other state reflecting his then existing mental or emotional condition. And this for the purpose of proving the truth of the matter asserted in the statement-that Cohen actually was afraid or distraught-because the preamble to F.R.E. 803 provides that such testimony "is not excluded by the hearsay rule." *But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition-"I'm scared"-and not belief-"I'm scared because Galkin threatened me."* Cohen's witnesses were permitted to relate any direct statements he had made concerning his state of mind but were prevented only from testifying as to his statements of belief-that he believed that Galkin was threatening him. There was no error.

*Id.* (emphasis supplied). The Eleventh Circuit explained that such a rule was in consonance with the Advisory Committee Notes to the Federal Rules of Evidence:

> The testimony admitted in this case was not limited to the fact that Iglesias had expressed remorse, but also included the fact that he said he apologized for and asked forgiveness for having stolen the belts. The testimony most often came in response to questions from Duran's counsel about how the witness knew Iglesias had stolen the belts. What Iglesias said was offered to show not only that he was remorseful, but also that he had stolen the belts. Rule 803(3) expressly prohibits the use of a statement of then-existing state of mind in this way. That prohibition, the committee notes explain, is necessary "to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind." Fed.R.Evid. 803(3) advisory committee's notes.

*Samaniego*, 345 F.3d at 1283.

The point is simple: under the state trial court's interpretation, any hearsay statement would be admissible if it were preceded by the statement, "I am (insert state of mind) because X." Such an interpretation would completely destroy the general prohibition against the admissibility of

hearsay statements. While MRE 803(3) allows the admission of hearsay statements that go to the declarant's state of mind, statements that go to why the declarant has a certain state of mind are inadmissible. The state trial court's admission, under MRE 803(3), of the hearsay statements of the victim through her mother's testimony was therefore error.

The hearsay statement that the victim was raped, however, would be admissible under another hearsay exception. Under the common law rule of fresh complaint,

> the fact of complaint by a victim of rape could be shown in corroboration of the prosecutrix, but the details could not. . . . The basis of the admission of the fact of complaint is that an assaulted woman will tell about it at the first opportunity; failure to make complaint impeaches her claim of assault; so complaint may be shown to corroborate her claim.

*People v. Baker*, 232 N.W. 381, 382 (Mich. 1930). Such a statement is admissible only if the victim makes the statement at the earliest possible opportunity. *People v. Vaughn*, 255 N.W.2d 677, 679 (Mich. Ct. App. 1977). A statement as to the identity of the attacker, however, is inadmissible.[3] *Id.* at 680 (citing *People v. Rock*, 277 N.W. 873 (Mich. 1938)).

In this case, the victim told her mother that she had been raped the morning after the alleged attack at approximately 7:30 a.m.. The victim therefore made complaint of the rape at the earliest possible opportunity, considering that her encounter with Petitioner, under both her and Petitioner's version of events, lasted until 5 a.m. Under these circumstances, the statement that the victim had

---

[3]A potential issue is whether this common law hearsay exception has been superseded by the Michigan Rules of Evidence, which were adopted on January 5, 1978 and made effective on March 1, 1978. While the Michigan Supreme Court has not ruled directly on this issue, in 1988 that court stated that the rule of fresh complaint "is still universally recognized." *People v. Straight*, 424 N.W.2d 257, 262 n.11 (Mich. 1988) (citation omitted). In our view, this statement supports the position that the rule of fresh complaint has not been superseded by the Michigan Rules of Evidence.

been raped was properly admitted, albeit for a reason other than that supplied by the state trial court. The statement that Petitioner raped the victim, however, does not fall under the fresh complaint rule and should have been excluded, as it was a statement as to the identity of the attacker. Its admission was therefore error.

While neither the parties nor the district court addressed the hearsay exception under the common law rule of fresh complaint, "[t]his Court may affirm the decision of the district court on any grounds, including one not considered by the district court." *McCormick v. Braverman*, — F.3d —, 2006 WL 1676134, at *12 (6th Cir. 2006) (citation omitted).

In a similar vein, under Michigan law, the admission of hearsay evidence under an incorrect hearsay exception is not reversible error, where such hearsay evidence is properly admissible under another hearsay exception not considered by the state trial court. *Duke*, 400 N.W.2d at 685 (finding no reversible error where the state trial court incorrectly relied on MRE 803(3) to admit hearsay evidence, but where such hearsay evidence was admissible under MRE 803(4)).

The issue in this case is whether the state evidentiary error of admitting hearsay evidence was sufficiently egregious so as to warrant federal habeas relief. In our view, when the state trial court admitted evidence on an improper basis, but that evidence was otherwise admissible, the petitioner fails to demonstrate that the state trial court's admission of such evidence was "so egregious that it results in a denial of fundamental fairness" such that habeas relief is warranted. *Bugh*, 329 F.3d at 512 (citation omitted). Because the hearsay statement, that the victim was raped, was properly admissible under the rule of fresh complaint, Petitioner is not entitled to habeas relief merely because the state trial court chose an incorrect basis to admit the statement. The victim's

identification of her attacker, however, was not admissible, so this Court must now determine whether the state trial court's evidentiary error in this respect gives rise to federal habeas relief.

## 2.    Prejudice

Petitioner must demonstrate that the erroneous admission of the hearsay statement, the victim's identification of Petitioner as her attacker, was sufficiently prejudicial so as to render his trial fundamentally unfair. Petitioner has failed to meet this substantial burden.

As explained, *supra*, the hearsay statement that the victim was raped was admissible; the only inadmissible hearsay evidence was the victim's statement as to the identity of her attacker, who the victim claimed was Petitioner. The admission of this statement of identification could not have prejudiced Petitioner, because Petitioner did not raise an identity defense. Instead, Petitioner's defense was that a sexual encounter had occurred between the victim and Petitioner, but that encounter was consensual. Every witness that Petitioner called for his case in chief established or attempted to establish that Petitioner was in the company of the victim during the time in question. During closing argument, Petitioner stated that "[t]he essence of this case I think is a night of consensual activity" and that the victim "willingly did whatever she did with [Petitioner]." (J.A. at 339, 341.) In short, the victim's identification of Petitioner did not conflict with or otherwise cause prejudice to Petitioner's defense, as Petitioner readily admitted that he and the victim were together during the time in question. The admission of this identification therefore could not have been "a crucial, critical, highly significant factor in the [defendant's] conviction." *Singletary*, 952 F.2d at 1296 (alteration in the original). The blow to Petitioner's defense arose from the admission of the hearsay statement that the victim was raped, a statement that was properly admissible.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court denying the habeas petition.